# United States Court of Appeals

### FOR THE EIGHTH CIRCUIT

_____

No. 98-2549

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| Billie Jerome Allen, | * | |
| | * | [PUBLISHED] |
| Appellant. | * | |

_____

Submitted:  September 15, 2004
Filed:  May 2, 2005

_____

Before LOKEN, Chief Judge, RICHARD S. ARNOLD,[1] WOLLMAN, HANSEN, MORRIS SHEPPARD ARNOLD, MURPHY, BYE, RILEY, MELLOY, SMITH, COLLOTON, and BENTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

Billie Jerome Allen and Norris G. Holder were convicted of the violent St. Patrick's Day, 1997, armed robbery of the Lindell Bank & Trust in St. Louis, Missouri, during which security guard Richard Heflin was killed.  In accordance with the Federal Death Penalty Act (FDPA), the grand jury returned an indictment that

_____

[1] The Honorable Richard S. Arnold died on September 23, 2004.  This opinion is filed by the remaining judges of the en banc court.  See 8th Cir. R. 47E.

charged the elements of the offenses.  After the indictment was returned and before a trial was conducted, the government filed a notice of intent to seek the death penalty pursuant to 18 U.S.C. § 3593(a) that set forth both the statutory aggravating factors contained in 18 U.S.C. § 3592(c) and the mens rea requirement from 18 U.S.C. § 3591(a)(2) which, if proved to the petit jury beyond a reasonable doubt,  made the offenses eligible for the death penalty.  After a trial, the petit jury found Allen guilty of killing a person during the course of a bank robbery, in violation of 18 U.S.C. § 2113(a) and (e), and of murdering a person with a firearm used during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1) and (j)(1).  After the penalty phase, the petit jury determined that a sentence of life imprisonment was justified on Count I and that a sentence of death was justified on Count II.  The district court[2] sentenced Allen accordingly.

On appeal, a divided panel of this court affirmed Allen's convictions and sentence in all respects.  United States v. Allen, 247 F.3d 741 (8th Cir. 2001).  In particular, we rejected his argument that the Fifth Amendment required the statutory aggravating factors to have been charged by the grand jury and included in the indictment.  We applied the holding of Walton v. Arizona, 497 U.S. 639, 647-49 (1990), that aggravating factors are not elements of a capital offense for Sixth Amendment purposes.  Allen, 247 F.3d at 761-64.  Allen petitioned the United States Supreme Court for a writ of certiorari.

While Allen's petition was pending, the Supreme Court decided Ring v. Arizona, 536 U.S. 584 (2002).  Ring held that aggravating factors are the functional equivalent of elements of a capital offense for Sixth Amendment purposes, and consequently overruled Walton in relevant part.  Id. at 609.  The Supreme Court granted Allen's petition for a writ of certiorari, vacated our judgment, and remanded

_____

[2] The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

the case to us for further consideration in light of <u>Ring</u>.  <u>Allen v. United States</u>, 536 U.S. 953 (2002).  On remand, a divided panel of this court concluded that it was error not to charge at least one statutory aggravating factor in Allen's indictment, and that although the error was not structural, the indictment defect was not harmless beyond a reasonable doubt.  <u>United States v. Allen</u>, 357 F.3d 745, 748-58 (8th Cir. 2004).  We subsequently granted rehearing en banc and vacated the panel's judgment.

We now confront the following questions:  (1) Does the Fifth Amendment require that at least one statutory aggravating factor and the mens rea requirement be found by the grand jury and charged in the indictment?  (2) If Allen's indictment was defective, was the error structural or subject to review for harmless error?  (3) If our review is for harmless error, was the error harmless beyond a reasonable doubt?  (4) Is the FDPA unconstitutional because it directs the government to charge aggravating factors in a notice of intent to seek the death penalty rather than in an indictment?

We address these issues *seriatim* and, ultimately, we again affirm Allen's convictions and sentence.

## I.

<u>Ring</u> was a case about a defendant's Sixth Amendment right to have capital aggravating factors proven to the petit jury beyond a reasonable doubt because they are facts that increase the penalty for his crime beyond the otherwise applicable statutory maximum.  In Allen's case, the petit jury made the findings that <u>Ring</u> expressly requires.  <u>Ring</u> did not address whether the Fifth Amendment also requires capital aggravating factors to be found by the grand jury and included in the indictment.  Nonetheless, we think that <u>Ring</u> necessarily implies such a Fifth Amendment requirement.

<u>Ring</u> did not address the indictment issue because it involved a state prosecution, and the Fifth Amendment's grand jury requirement has not been

construed to apply to the states.  The same is true of the predecessor to <u>Ring</u>, <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 477 n.3 (2000).  We therefore look to the predecessor to <u>Apprendi</u>, <u>Jones v. United States</u>, 526 U.S. 227 (1999), which did involve a federal prosecution.  There, we find the rule that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."  <u>Id.</u> at 243 n.6; <u>see also</u> <u>Apprendi</u>, 530 U.S. at 476 (same (quoting <u>Jones</u>)).

In other words, the same facts that the Sixth Amendment requires to be proven to the petit jury beyond a reasonable doubt in state and federal prosecutions must also be found by the grand jury and charged in the indictment in federal prosecutions.  We therefore conclude that the Fifth Amendment requires at least one statutory aggravating factor and the mens rea requirement to be found by the grand jury and charged in the indictment.  <u>See</u> <u>United States v. Robinson</u>, 367 F.3d 278, 284 (5th Cir.), <u>cert. denied</u>, 125 S. Ct. 623 (2004); <u>United States v. Higgs</u>, 353 F.3d 281, 299 (4th Cir. 2003), <u>cert. denied</u>, 125 S. Ct. 627 (2004); <u>United States v. Quinones</u>, 313 F.3d 49, 53 n.1 (2d Cir. 2002), <u>cert. denied</u>, 540 U.S. 1051 (2003).  The indictment must include at least one statutory aggravating factor to satisfy the Fifth Amendment because that is what is required to elevate the available statutory maximum sentence from life imprisonment to death.  In turn, at least one of the statutory aggravating factors found by the petit jury in imposing the death sentence must have been one of the statutory aggravating factors charged by the grand jury in the indictment.  <u>See</u> <u>Higgs</u>, 353 F.3d at 299 n.7.  The same is true of the mens rea requirement.

Having reached this conclusion, it is clear that Allen's indictment suffers a Fifth Amendment defect.  The petit jury found two statutory aggravating factors in sentencing him to death: that Allen "in the commission of the offense, or in escaping apprehension . . ., knowingly create[d] a grave risk of death to one or more persons

in addition to Richard Heflin," and that he "commit[ted] the offense in the expectation of the receipt of anything of pecuniary value." The petit jury also found the requisite mental state in sentencing Allen to death: that he "intentionally inflicted serious bodily injury which resulted in the death of Richard Heflin." The government had included these factors and the mens rea requirement in its notice of intent to seek the death penalty, but they were not charged in the indictment because Allen's prosecution preceded <u>Ring</u> by years. Allen presciently raised a <u>Jones</u>-type objection before the district court, preserving this error for our review. Hence, this is not a plain-error case. We next consider whether the failure to charge at least one statutory aggravating factor and the mens rea requirement in the indictment was structural error.

II.

Allen rightly directs our attention to the strongest case in his favor, <u>Stirone v. United States</u>, 361 U.S. 212 (1960). Stirone was charged by indictment with unlawfully interfering with the movement of sand in interstate commerce for use in mixing concrete. Over his objections, the district court allowed the government to present at trial evidence that Stirone also interfered with the movement of steel in interstate commerce, and the district court instructed the jury that Stirone was guilty if he interfered with either sand or steel that moved in interstate commerce. See <u>id.</u> at 213-14. The Supreme Court found a violation of Stirone's Fifth Amendment right to indictment by a grand jury, concluding that "[d]eprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." See <u>id.</u> at 215-17. Concluding that "neither this nor any other court can know that the grand jury would have been willing to charge that Stirone's conduct would interfere with interstate exportation of steel," and that "it cannot be said with certainty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned," the Supreme Court overturned his conviction. See <u>id.</u> at 217-19. <u>Stirone</u> quoted <u>Ex parte Bain</u>, 121 U.S. 1, 10 (1887), for the proposition that it is beyond "the province of a court

-5-

to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes." See Stirone, 361 U.S. at 216.

Allen urges that Stirone and Bain show that the defect in his indictment must be treated as a structural error requiring automatic reversal without a showing of prejudice to the defendant. We cannot agree. At the time of Stirone and Bain, the Supreme Court had not yet grappled with the question whether constitutional error can be harmless. The Court did so expressly for the first time in Chapman v. California, 386 U.S. 18, 20, 23-24 (1967), when it rejected the view that all constitutional errors automatically call for reversal and held that–with a few exceptions–federal courts may not grant relief when a constitutional error is shown to be harmless beyond a reasonable doubt. Next, in Rose v. Clark, 478 U.S. 570, 578 (1986), the Court "emphasized . . . that while there are some errors to which Chapman does not apply, they are the exception and not the rule." "Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." Id. at 579.

Then, in Arizona v. Fulminante, 499 U.S. 279, 309 (1991), the Supreme Court surveyed its precedent to identify exactly which constitutional errors constitute "structural defects . . . which defy analysis by 'harmless-error' standards." The Court identified five such errors: the total deprivation of the right to counsel, the denial of the right to an impartial judge, unlawful discrimination in the grand-jury selection process, the denial of the right to self-representation at trial, and the denial of the right to a public trial. See id. at 309-10. Notably absent from this list of structural defects is the type of defective indictment at issue in Stirone and Bain.

Most recently, in Neder v. United States, 527 U.S. 1, 8 (1999), the Supreme Court again listed the limited class of cases in which it had found an error to be

-6-

structural:  the five types of error listed in <u>Fulminante</u>, plus the giving of a defective instruction on reasonable doubt (a type of error recognized as structural for the first time in 1993, and hence not included in <u>Fulminante</u>'s 1991 list).  Again, the Court made no reference to the type of defective indictment at issue in <u>Stirone</u> and <u>Bain</u>.

We tend to think that the Supreme Court meant for its lists of structural errors in <u>Fulminante</u> and <u>Neder</u> to be exhaustive.  But even if we are wrong on that count, we believe that the holding of <u>Neder</u> has particular significance to the case at bar, because <u>Neder</u> is in some ways the mirror image of <u>Allen</u>.  Neder was charged by indictment with tax fraud, which has as an element that the false statements made by the taxpayer be material.  Over Neder's objection, the district court instructed the petit jury not to consider the materiality of any false statements he made because materiality was an issue of law for the district court to decide.  <u>See</u> <u>id.</u> at 6.  Although the Supreme Court agreed that this deprived Neder of his Sixth Amendment right to have every element of the charged offense be proven to the petit jury beyond a reasonable doubt, the Court concluded that the error was not structural and should be analyzed for harmless error.  <u>See</u> <u>id.</u> at 8-15.  The Court found the error harmless beyond a reasonable doubt by "conduct[ing] a thorough examination of the record" of the evidence presented at trial and concluding that "no jury could reasonably find" that Neder's false statements were not material because the record did not "contain[] evidence that could rationally lead to a contrary finding with respect to the omitted element" of materiality.  <u>See</u> <u>id.</u> at 16-20.

We find <u>Neder</u> instructive because, just as Neder was deprived of his Sixth Amendment right to have the petit jury determine an essential element of his offense, Allen was deprived of his Fifth Amendment right to have the grand jury decide whether to charge the statutory aggravating factors and the mens rea requirement that are the functional equivalent of elements of his offense.  Given that the Supreme Court concluded that the Sixth Amendment error was not structural and should be analyzed for harmless error, we are persuaded that we should approach the Fifth

Amendment error the same way.  We therefore conclude that the defect in Allen's indictment was not structural error.  See Robinson, 367 F.3d at 285-86; Higgs, 353 F.3d at 304-06; accord United States v. Moss, 252 F.3d 993, 1000-01 & n.8 (8th Cir. 2001) (Apprendi indictment error is not structural), cert. denied, 534 U.S. 1097 (2002).  Thus, we proceed to inquire whether the defect in Allen's indictment was harmless beyond a reasonable doubt.

### III.
#### A.

The test for harmless error is straightforward.  "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a).  "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman, 386 U.S. at 24.  It is the government's burden to demonstrate that the defendant was not prejudiced by the error.  See id.  When the error at issue is the failure to have a jury make a necessary finding, such as in an Apprendi-affected drug case, we review the relevant evidence in the record to determine what "any rational jury" would have done if asked to make the necessary finding.  See United States v. Anderson, 236 F.3d 427, 430 (8th Cir.) (petit jury case), cert. denied, 534 U.S. 956 (2001).  The "rational jury" test was the one the Supreme Court employed in Neder. See 527 U.S. at 18 (petit jury case).

Our inquiry, then, is whether any rational grand jury–and we presume that Allen's grand jury was rational–would have found the existence of the requisite mental state and one or more of the statutory aggravating factors found by the petit jury if the grand jury had been asked to do so.  We are presented with three possible ways to conduct that harmless-error inquiry in this case.  One approach would be to limit our review to the evidence presented to the grand jury when it was asked to indict Allen.  Another approach would be to review the entire record, including the evidence presented to the petit jury at the trial and penalty phase.  A third approach

-8-

would be to view the petit jury's verdict, which unanimously found the existence of the mens rea requirement and the aggravating factors beyond a reasonable doubt, as proof that the grand jury in this case would have charged the requisite mental state and the aggravating factors in the indictment.

When we are confronted with several possible grounds for deciding a case, any of which would lead to the same result, we choose the narrowest ground in order to avoid unnecessary adjudication of constitutional issues.  See United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 478 (1995).  In this case, the narrowest method of conducting harmless-error review is to limit ourselves to the evidence presented to the grand jury at the time it was asked to indict Allen.  Because application of this method satisfies us beyond a reasonable doubt that the error in this case was harmless, we express no present opinion on the validity of conducting harmless-error review with reference to the entire record, cf. United States v. Wright, 248 F.3d 765, 766-67 (8th Cir. 2001), or the validity of using the petit jury's verdict on the aggravating factors and the mens rea requirement as proof that the grand jury would have charged the aggravating factors and the requisite mental state in the indictment, cf. United States v. Mechanik, 475 U.S. 66, 70 (1986).

### B.

We now explore the possible ways that the Fifth Amendment error in this case could have prejudiced Allen.  The two primary purposes of an indictment are to give the defendant clear notice of the allegations that he will have to defend himself against at trial, and to allow the defendant to plead prior prosecution as a bar to future prosecution.  See United States v. Miller, 471 U.S. 130, 134-35 (1985).  There is no dispute that Allen had complete and timely notice of the allegations against him, through the combination of the indictment and the notice of intent to seek the death penalty, and that his defense during both the guilt and penalty phases was in no way prejudiced.  Nor is there any dispute that the indictment was sufficiently clear to allow Allen to use it as a bar to being prosecuted again for the same conduct.

The two primary purposes of the grand jury are, first, to make "the determination whether there is probable cause to believe a crime has been committed" and, second, "the protection of citizens against unfounded criminal prosecutions." See United States v. Calandra, 414 U.S. 338, 343 (1974). We discuss at length below the grand jury's probable-cause function, and we deal first with its role of protecting citizens against unfounded prosecutions. In this capacity, the grand jury "has been regarded as a primary security to the innocent against hasty, malicious[,] and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will." See Wood v. Georgia, 370 U.S. 375, 390 (1962). There is not the slightest suggestion in this case that the government engaged in the hasty, malicious, or oppressive persecution of an innocent man. There is likewise no allegation that the prosecution was unreasoned, or that the government singled Allen out for prosecution because of personal ill will toward him, racial animus, or any other discriminatory reason.

C.

We now turn to the grand jury's responsibility to determine probable cause. We ask whether any rational grand jury, including Allen's grand jury, would have found probable cause to charge at least one of the statutory aggravating factors and the mens rea requirement found by the petit jury if the grand jury had been asked to do so. As explained above, we limit our review to the evidence presented to Allen's grand jury. One of the two statutory aggravating factors that the petit jury found in imposing the death sentence was that Allen, "in the commission of the offense, or in escaping apprehension . . ., knowingly create[d] a grave risk of death to one or more persons in addition to Richard Heflin." The following grand jury testimony demonstrates that the grand jury would have charged that statutory aggravating factor if it had been asked to do so.

-10-

Lisa Moore, a bank teller, told the grand jury that she was pregnant at the time the robbery occurred. That day, she was working at the bank along with three other tellers and Heflin. There was one customer present, Michael West, who also worked as the bank's maintenance man. The first robber appeared in the bank, fired three shots in Heflin's direction, and shouted, "Everybody get the f*** down." When Mr. West turned to run, the robber raised his assault rifle and fired three shots at Mr. West, but missed. Mrs. Moore then complied with the robber's demand by lying face-down in the teller area. When the robber entered the teller area by vaulting over the gate that separated it from the lobby, she looked up at him. He pointed his gun at her head and said, "B****, I said, get the f*** down." He then fired a shot into the wall. While the robber took money from the teller area, Mrs. Moore could hear the second robber firing shots in the lobby and shouting instructions to the first robber. When the first robber left the teller area, she again looked up at him, and he said, "B****, I told you, stay down." The two robbers then exited the bank. Mrs. Moore went to the lobby, where she observed that Heflin had been shot. Mrs. Moore subsequently decided to quit her job at the bank for her safety and the safety of her unborn child.

Terry Gear, a friend of Holder's, testified before the grand jury that Holder invited him to be part of the bank robbery. Holder said that he was not going to get caught because he had an SKS assault rifle that could shoot through "police cars and vests." Holder said that he and his associates "weren't going to let anything stop them," and if anyone tried to catch him, "he was going to X them out." Gear declined Holder's invitation to participate in the bank robbery.

FBI Special Agent Ann Pancoast told the grand jury that she had investigated the bank robbery. Heflin died of multiple gunshot wounds, some from direct shots and some from ricochets. Each bank robber had discharged a semiautomatic assault rifle in the bank. Authorities recovered a total of sixteen spent shell casings and observed numerous bullet holes in the walls. The two bank robbers fled in a van that

they had doused with gasoline.  The van crashed in Forest Park and became totally engulfed by flames.  Bystanders in the park heard explosions inside the van, later determined to be ammunition cooking off.

This grand jury testimony persuades us beyond a reasonable doubt that, if the grand jury had been asked to charge the grave-risk-of-death-to-others statutory aggravating factor, it would have done so.  The government would have needed to persuade only a simple majority of the twenty-three-member grand jury to find probable cause.  See Fed. R. Crim. P. 6(f) (twelve-juror-majority requirement); United States v. Conley, 186 F.3d 7, 16 n.4 (1st Cir. 1999) (probable cause requirement), cert. denied, 529 U.S. 1017 (2000).  The grand jury testimony reviewed above showed that (1) both bank robbers fired multiple shots from semiautomatic assault rifles while they were in the bank, for a combined total of sixteen shots; (2) one bank robber pointed his gun at Moore's head and fired a shot into the nearby wall to intimidate her into following his instructions; (3) one bank robber fired three shots at West when West turned to run; (4) multiple shots ricocheted through the lobby; (5) when planning the robbery, Holder had indicated that he would kill anyone who tried to prevent him from robbing the bank or tried to catch him; and (6) in fleeing the scene of the crime, the two bank robbers crashed a flaming gasoline-saturated van which contained exploding ammunition into St. Louis's largest park on St. Patrick's Day.

We therefore conclude that any rational grand jury, including Allen's grand jury, would have found probable cause to charge that Allen knowingly created a grave risk of death to persons other than Heflin while committing the bank robbery or in escaping apprehension.  The failure to charge this statutory aggravating factor in the indictment was therefore harmless error.[3]  See United States v. Davis, 380 F.3d

---

[3] We note that the government's failure to charge any statutory aggravating factors or the mens rea requirement in the indictment was not the product of malice

821, 829-30 (5th Cir. 2004); <u>Robinson</u>, 367 F.3d at 286-89; <u>Higgs</u>, 353 F.3d at 306-07.

We reach the same conclusion about the mens rea requirement.  As noted above, the requisite mental state found by the petit jury in sentencing Allen to death was that he "intentionally inflicted serious bodily injury which resulted in the death of Richard Heflin."  The FDPA provides four ways to prove the requisite mental state, and the one employed here did not require the government to prove that Allen intentionally killed Heflin, only that he intentionally inflicted serious bodily injury that resulted in Heflin's death.  <u>Compare</u> 18 U.S.C. § 3591(a)(2)(A) <u>with</u> 18 U.S.C. § 3591(a)(2)(B).  It is well established that criminal intent, including the intent to cause serious bodily injury, may be inferred from circumstantial evidence.  <u>See</u> <u>United States v. Waldman</u>, 310 F.3d 1074, 1077-78 (8th Cir. 2002).

Mrs. Moore testified before the grand jury that she thought she recognized the voice or speech mannerisms of the second robber–the one who she testified had remained in the lobby while the first robber collected the money from the teller area, who had shouted instructions to the first robber, and whom she did not see–as being Holder's.  She had heard Holder's voice many times before because he came into the bank once a month, every month, to make a $500 withdrawal from his account.  Holder preferred to have Mrs. Moore wait on him, and records showed that she had done so in eight of the past twelve months, including when he made a withdrawal four days before the bank robbery.  This left the grand jury logically to infer that the first robber–the one who had fired three shots in Heflin's direction–was Allen.

---

toward Allen or defiance of the law.  Rather, the government was complying with the law as it then existed:  <u>Walton</u> remained good law and <u>Ring</u> was years away.  Likewise, after <u>Ring</u> was decided, the Department of Justice brought itself into compliance with the changed legal landscape by adopting a policy of including these factors in indictments in FDPA prosecutions.  <u>See</u> <u>Robinson</u>, 367 F.3d at 284 n.6.

Agent Pancoast told the grand jury that two of the bullets found in Heflin's body had been fired from the Chinese-manufactured assault rifle used by one of the robbers. Clips of ammunition for the Chinese-manufactured assault rifle were found in the pocket of a black leather coat that was discarded along the route that Allen took through Forest Park in fleeing from the burning van. Agent Pancoast also testified before the grand jury that Allen and Holder each gave statements to the police about the crime after they were arrested, and each identified Allen as the one who entered the bank first and shot Heflin. Heflin died at the hospital from the gunshot wounds he suffered during the robbery, Agent Pancoast told the grand jury.

We therefore conclude that any rational grand jury, including Allen's grand jury, would have found probable cause to charge Allen with the requisite mental state, i.e., that he intentionally inflicted serious bodily injury that resulted in Heflin's death.

## D.

Given our confidence beyond a reasonable doubt in the way a rational grand jury would have acted based on the evidence presented, the only conceivable benefit Allen was deprived of was a chance at grand jury nullification. However, we have previously held that the possibility of jury nullification "does not transform a harmless error into a prejudicial one." United States v. Horsman, 114 F.3d 822, 829 (8th Cir. 1997), cert. denied, 522 U.S. 1053 (1998). "Accordingly, where the only possible deprivation suffered by the defendant is the possibility of jury nullification, the defendant's substantial rights have not been violated." Id. (citation and internal marks omitted). Moreover, we see no realistic possibility that Allen's grand jury would have declined to charge a statutory aggravating factor or the mens rea requirement in order to avoid exposing Allen to the death penalty. The grand jury was told that Allen would be eligible to receive the death penalty if he was indicted for the crimes alleged when the Assistant United States Attorney read 18 U.S.C. §§ 924 and 2113, including their penalty provisions, to the grand jury immediately before it began its deliberations.

-14-

IV.

Finally, we turn to Allen's constitutional challenge to the FDPA.  He argues that the Act is unconstitutional after <u>Ring</u> because it directs the government to charge aggravating factors and the requisite mental state in a notice of intent to seek the death penalty rather than in an indictment.  We disagree.  While it is true that the FDPA directs the government to charge these factors in a notice of intent to seek the death penalty, nothing in the Act precludes the government from also submitting them to the grand jury for inclusion in the indictment.  This is the practice that the Department of Justice has adopted after <u>Ring</u>, and it preserves the constitutionality of FDPA prosecutions.  <u>See</u> <u>United States v. Barnette</u>, 390 F.3d 775, 788-90 (4th Cir. 2004); <u>Robinson</u>, 367 F.3d at 290.

V.

In sum, we conclude that although the Fifth Amendment requires that at least one statutory aggravating factor and the requisite mental state be found by the grand jury and charged in the indictment in FDPA prosecutions, the failure to do so in this pre-<u>Ring</u> case was harmless beyond a reasonable doubt; and we conclude that <u>Ring</u> did not render the FDPA unconstitutional.  Having complied with the Supreme Court's instructions that we give Allen's case further consideration in light of <u>Ring</u>, we affirm the judgment of the district court for the reasons stated above.

_____